THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. MARTÍN LINARES ET AL., Defendants and Appellants.

No. CR-67-14.    Decided December 6, 1967.

*José H. Luciano Vélez* for appellants. *J. F. Rodríguez Rivera, Acting Solicitor General,* for The People.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Appellants were convicted of adulterating milk. Section 1 of Act No. 77 of August 12, 1925, as said section was amended by Act No. 77 of June 17, 1955, provides that:

"Every person who adulterates or dilutes milk and every person who sells, offers, or keeps for sale milk so adulterated or diluted, or who transports or stores such milk to be used for human consumption or for the purpose of submitting it to the process of pasteurization or any other process preparatory for human consumption, and every person using adulterated or diluted milk for industrial purposes, when such milk is to be used in the preparation of food for human consumption, shall be guilty of a misdemeanor. . . ."

Section 2 of the aforesaid Act of 1925 provides that "the standard grade of milk shall be fixed by the Secretary of Health and published for general knowledge in such newspapers having the greatest circulation in the Commonwealth as said Secretary may determine."

■ Act No. 77 of 1925 substituted Act No. 59 of March 10, 1910. Section 1 of Act No. 59 of 1910 provided that:

"Every person who adulterates or dilutes milk with the intent to offer the same for sale, or cause or permit it to be offered for sale, and every person who sells, offers or keeps the same for sale, is guilty of a misdemeanor. . . . *The adulteration or dilution of milk may be proved in the usual manner provided by law for the trial of criminal cases, but in any event milk shall be deemed and held to be adulterated or diluted when the same does not conform to the standard that shall be prescribed by the competent authorities;* Provided, that the standard of milk shall be fixed by the Director of Health, Charities and Correction, and published for general knowledge in the Official Gazette and in the newspapers having the largest circulation in the Island, which shall be determined by the said official." (Italics ours.)

It may be noted that the Act of 1925 eliminated the part italicized above by stating, upon establishing the offense, that milk shall be deemed to be adulterated or diluted when

the same does not conform to the standard prescribed by the competent authorities.

Regulation No. 8 of the Secretary of Health of September 19, 1957, 24 R.&R.P.R. § 792–1, provides that cow's milk shall contain a minimum of 12% total solids and 3% milk fat; and a maximum of 88% water. Section 792–13 provides the following:

"All milk shall be considered adulterated if the following analytical facts appear:

(1) In the acetic serum:

(A) A quantity less than 0.715 gram of mineral matter for each 100 cc. and at the same time.

(B) A cipher less than 39.0 in the reading of the immersion refractometer at 20°· C.

(2) In the acid serum of natural sour milk:

(A) A quantity less than 0.73 gram of mineral matter for each 100 cc. and at the same time.

(B) A cipher less than 38.3 in the reading of the immersion refractometer at 20° C.

(3) (A) A quantity less than that mentioned for mineral matter in the acetic serum or acid serum of natural sour milk in paragraphs (1) and (2) of this section and at the same time.

(B) A cipher less than 36.0 in the reading of copper serum in the immersion refractometer at 20° C."

In *People* v. *Pérez*, 23 P.R.R. 815, decided May 22, 1916, we said that Act No. 59 of March 10, 1910, does not specify how milk may be adulterated or diluted, but provides that the adulteration or dilution consists in its not conforming to the standard grade of milk. Therefore, the information need not allege the specific manner how it was adulterated.

In *People* v. *Rivera et al.*, 31 P.R.R. 612, decided March 26, 1923, we again referred to § 1 of Act No. 59 of 1910. We said that in order to determine the fact of the adulteration, the chemist referred to the standard established by the Department of Health, and from the analysis it appeared that water had been added in a 20% proportion

for which reason it contained 89.654% of water, while the maximum amount fixed by the standard is 88%. This *Rivera* case, as well as the former *Pérez* case, applied the Act of 1910 in which, as it has been noted, it was provided that milk shall be deemed to be adulterated or diluted when the same does not conform to the standard prescribed by the competent authorities.

■ Under the Act of 1910 as well as under the present Act of 1925, the offense is committed, in the modality in question, by adulterating or diluting the milk, and as thus adulterated to sell, offer it or keep it for sale. The information in this case charges that the appellants, one the owner of the dairy and the other an employee, had in their possession for human consumption milk which when analyzed appeared to have 1.4% less milk fat than that specified by the act, that is less than 3%. The fact that the analysis of the milk showed less than 3% of fat is not in dispute. But because of the absence in the Act of 1925 of the provision contained in the Act of 1910, which was eliminated, to the effect that milk shall be deemed to be adulterated or diluted when the same does not conform to the standard prescribed by the competent authorities, it is necessary to examine the evidence for the prosecution to see whether the offense, that is the adulteration, was proven as it should be done in a criminal prosecution.

The health officer testified that at 9:05 a.m. of July 9, 1964, he took a sample of the milk in the dairy of appellant Linares, and he took it from a refrigerating tank which contained 1,200 liters. The defense accepted that the milk was for sale to a co-operative for pasteurization. The officer said that the container he used was clean and "*steri-lized.*" That he took the milk from the top of the tank and the beater was working. He did not notice anything abnormal in the tank or in the milk.

He testified that he took the sample in a milk can which he borrowed from the employee and appellant Ismael Román. That was not the utensil used by him for taking samples; he had left the one he used that same day in another dairy where he also took samples of milk. The beater of the tank was moved by an electric motor. He said that he took the can, put it inside the milk tank, and took enough out to fill the three sample bottles. He stated that he had intervened many times with this dairy in the course of five years during which he had been posted in that area, and the milk had not been adulterated before. This had been the first time that he had misplaced the container he used to take samples. The milk can which he borrowed from the employee was under the sink faucet. He said that the employee washed it in three tanks with soap water, clorox, and clear water. He put the can inside the tank and filled it in an up-and-down movement.

The chemist from the Department of Health testified that the percentage of minimum milk fat in milk for human consumption is 3% and this one had 1.4%; that one of the forms of adulteration is to add water or powdered milk, or both things. Water artificially added was not found in the milk. The analysis was not made to determine the addition of powdered milk. Since milk fat is less dense than water, in a milk container, independently of the quantity, the fat always comes to the surface unless the milk is homogenized. The chemist could not determine whether the milk was homogenized or not, when the sample was taken. If the milk were not homogenized, the sample is not trustworthy. If the sample were taken from the bottom of the tank, it would not be trustworthy under those circumstances because the fat was on the top.

When cross-examined, he stated that he did not use the specific method to determine the addition of powdered milk. That the refraction of copper serum was 42.5, the refraction

of acetic serum was 48.3, the normal being not less than 39, and there were 12.27 of total solids.

The chemist explained at this moment to the court that he did not report the adulterated milk as having additional powdered milk, but as having a deficiency of milk fat.

The evidence for the defense produced in the first place the testimony of the appellant employee. He testified that the health officer had told him that he had left the sampling container in another place; he asked for a container and the witness told him that the only available one was the one he used to take milk to his house. The officer asked him to take the sample, and the witness bent down and took it from where the faucet was in the bottom of the tank. The beater was not working because the motor was defective, and it was being repaired some place else. In the meantime they beat the milk with a spade. He took the milk from the bottom because the container was on the floor, and he believed that the milk could curdle. The inside was clean but the outside was dirty.

The next testimony for the defense was that of an expert chemist, with 36 years of experience in the analysis of milk, 10 years working for Health, 8 years in the laboratory of the Police, and more than 30 thousand milk analyses, 25 thousand made for the Department of Health. He stated that he analyzed the sample, and it proved to be adulterated. The refraction of copper serum was 42.5, in excess of the minimum of 36.0. He affirmed that it had a 1.4% of milk fat. He said the milk was perfectly all right, it was normal. From the analytical data he reached the conclusion that it was a sample improperly taken, not trustworthy.

In this case, the scientific evidence for the prosecution was to the effect that the milk had no additional water. The analysis did not prove that it had over 88% of water. Regulation—24 R.&R.P.R. § 792–1. It had 12.27% of solids, more than the 12% minimum—§ 792–1. The analysis to determine

the addition of powdered milk was not made and the chemist did not rely on this to report the adulteration, but merely on the low milk fat.

The refraction of copper serum was of 42.5, in excess of the minimum of 36.0 of the Regulation—24 R.&R.P.R. § 792–13—which establishes what is adulterated milk. The refraction of the acetic serum was of 48.3, above the minimum of 39.0—§ 792–13.

The trial court decided the case on the grounds of the limited aspect of credibility. However, we have something more than that here. Without denying the court its primary function of giving credence, a more trustworthy scientific test which positively does not show any element of adulteration of § 792–13 or of § 792–1 except the low fat content, leads us to believe that the rational explanation of that low content in the light of all the evidence, the scientific test included, lies in the fact that the test was not trustworthy, according to the expert decision of the defense.

Perhaps situations like those in this case convinced the Legislator in 1925 to eliminate from the statute the statement which automatically deemed and held the milk to be adulterated, that is, the crime committed, if the same did not conform to the standard grade prescribed by the competent authorities.

We believe that there is no evidence sufficient at law in the record to support a conviction in a criminal prosecution.

The judgment will be reversed and the defendants-appellants will be acquitted.

Mr. Justice Belaval did not participate herein. Mr. Justice Blanco Lugo and Mr. Justice Ramírez Bages concur in the result.